*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CLIFTON E. JACKSON; CHRISTOPHER M.
SCHARNITZKE, on behalf of themselves and
all other persons similarly situated,
> *Plaintiffs-Appellants*,

> No. 10-1453

*v.*

SEDGWICK CLAIMS MANAGEMENT SERVICES,
INC.; COCA-COLA ENTERPRISES, INC., foreign
corporations; DR. PAUL DROUILLARD, jointly
and severally,

> *Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-11529—Nancy G. Edmunds, District Judge.

Argued: June 12, 2013

Decided and Filed: September 24, 2013

Before: BATCHELDER, Chief Judge; GUY, BOGGS, MOORE, COLE, CLAY,
GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE,
WHITE, STRANCH, and DONALD, Circuit Judges.[*]

_____

**COUNSEL**

**ARGUED:** Marshall D. Lasser, MARSHALL LASSER, P.C., Southfield, Michigan, for
Appellants. Kathleen H. Klaus, MADDIN HAUSER WARTELL, ROTH & HELLER,
P.C., Southfield, Michigan, Matthew F. Leitman, MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C., Troy, Michigan, Daniel B. Tukel, BUTZEL LONG, Detroit,
Michigan, for Appellees. **ON BRIEF:** Marshall D. Lasser, MARSHALL LASSER,
P.C., Southfield, Michigan, Jeffrey T. Stewart, SEIKALY & STEWART, P.C.,
Farmington Hills, Michigan, for Appellants. Kathleen H. Klaus, MADDIN HAUSER
WARTELL, ROTH & HELLER, P.C., Southfield, Michigan, Matthew F. Leitman,
Thomas W. Cranmer, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Troy,

_____

[*]The Honorable Boyce F. Martin, Jr., who was a member of the *en banc* court who heard this
case, retired on August 16, 2013, and did not participate in the decision.

Michigan, Daniel B. Tukel, BUTZEL LONG, Detroit, Michigan, Michael F. Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., for Appellees. Mark F. Horning, Jeffrey M. Theodore, STEPTOE & JOHNSON LLP, Washington, D.C., Allison M. Zieve, PUBLIC CITIZEN LITIGATION GROUP, Washington, D.C., Charles A. Rothfeld, Brian J. Wong, MAYER BROWN LLP, Washington, D.C., for Amici Curiae.

GIBBONS, J., delivered the opinion of the court, in which BATCHELDER, C. J., GUY, BOGGS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, and KETHLEDGE, JJ., joined.  CLAY, J. (pp. 20-23), delivered a separate opinion concurring in the judgment only.  MOORE, J. (pp. 24-40), delivered a separate dissenting opinion, in which COLE, WHITE, STRANCH, and DONALD, JJ., joined.

————————————

**OPINION**

————————————

JULIA SMITH GIBBONS, Circuit Judge.  Clifton Jackson and Christopher Scharnitzke were employees of Coca-Cola Enterprises, Inc. ("Coca-Cola") who suffered work-related injuries. They applied for workers' compensation benefits from Coca-Cola through Sedgwick Claims Management Services ("Sedgwick"), Coca-Cola's third-party benefit claims administrator.  Sedgwick disputed both of their claims and refused to pay benefits.  Jackson and Scharnitzke allege that Coca-Cola and Sedgwick "engaged in a fraudulent scheme involving the mail . . . to avoid paying benefits to injured employees," *Jackson v. Segwick Claims Mgmt. Servs.*, 699 F.3d 466, 473 (6th Cir. 2012), in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  Accordingly, they sued Coca-Cola, Sedgwick, and Dr. Paul Drouillard—a so-called "cut-off" doctor who allegedly colluded with Coca-Cola and Sedgwick to discontinue Jackson's benefits—in federal district court pursuant to RICO's civil-remedy provision.  *See* 18 U.S.C. § 1964(c).[1]

The district court granted the defendants' motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  A panel of this court reversed in

_____

[1] "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."  18 U.S.C. § 1964(c).

reliance on *Brown v. Cassens Transport Co.*, 675 F.3d 946 (6th Cir. 2012) (*Brown II*), which rejected many of the legal arguments the district court relied upon in granting the motion to dismiss.  As was true in *Brown II*, the panel was divided over the proper resolution of the appeal.  *See Jackson*, 699 F.3d at 485–87 (Batchelder, C.J., concurring in the judgment); *Brown II*, 675 F.3d at 969–74 (Gibbons, J., dissenting).  The court granted the defendants' petition to rehear this case *en banc*.  Because the plaintiffs have not pled an injury to their "business or property" that is compensable under § 1964(c), we overrule *Brown II* and affirm the district court's judgment.

## I.

We begin by providing some background about Michigan's workers' compensation system. "When Michigan adopted the [Workers' Disability Compensation Act ("WDCA")], it essentially created a 'no-fault' system under which a worker no longer has to establish negligence on the part of the employer but the employer is liable for certain expenses related to an injury suffered on the job without regard to fault." *Brown v. Cassens Transp. Co.*, 743 F. Supp. 2d 651, 661–62 (E.D. Mich. 2010) (*Brown I*), *rev'd*, 675 F.3d 946 (6th Cir. 2012).  This design ensures recovery for injured employees while creating greater certainty for employers. *Hesse v. Ashland Oil, Inc.*, 642 N.W.2d 330, 334 (Mich. 2002).  The system achieves this goal, in part, because "[t]he right to the recovery of benefits [under the WDCA is] the employee's exclusive remedy against the employer for a personal injury or occupational disease.  The only exception to this exclusive remedy is an intentional tort." Mich. Comp. Laws § 418.131.  If this were not the case, injured employees could circumvent the restrictions the WDCA places on the benefits an injured employee is entitled to receive. *See id.* §§ 418.301 (wage loss benefits), 418.315 (medical expenses), 418.319 (rehabilitation services).

In exchange for the employer's promise to pay certain types of benefits and the employee's promise to forsake other remedies, the workers' compensation system ensures efficient benefit payments and dispute resolution.  "An employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, *shall* be paid" workers compensation benefits

according to the statutory scheme once he provides notice of a work-related injury to an employer. *Id.* § 418.301(1) (emphasis added). Benefits to an injured employee "become due and payable on the fourteenth day after the employer has notice or knowledge of the disability." *Id.* § 418.801(1). Failure to pay benefits when owed can lead to the imposition of fines on the employer. *Id.* § 418.801(2).

If an employer believes an employee is not entitled to benefits, it may dispute the claim. An employer is not obligated to pay benefits or fines when there is an "ongoing dispute" over an employee's claim, regardless of the merits of the dispute. *Id.*; *see also Warner v. Collavino Bros.*, 347 N.W.2d 787, 790 (Mich. Ct. App. 1984) ("On its face [the statute] merely requires an 'ongoing dispute' and does not distinguish good faith disputes from bad faith or unreasonable disputes."). If the employee is later found to be entitled to benefits, the employer is liable for statutory interest for the period during which it withheld benefits. Mich. Comp. Laws § 418.801(6) ("When weekly compensation is paid pursuant to an award of a worker's compensation magistrate, an arbitrator, the board, the appellate commission, or a court, interest on the compensation shall be paid . . . ."); *McCaslin v. GM Corp.*, 349 N.W.2d 544, 546 (Mich. Ct. App. 1984) (observing that interest "is imposed because the employer benefits from the use of the money determined to be due to the employee and because the employee had to do without its use").

Because the workers' compensation system is typically the only remedy available to employees who suffer a work-related injury in Michigan, the state has created a comprehensive administrative system for resolving disputes between employers and employees over benefits:

> A disputed claim for benefits is first reviewed by a mediator, or at a hearing before a workers compensation magistrate [from the Worker's Compensation Agency Board of Magistrates]. Mich. Comp. Laws § 418.847. The statute provides that the parties may seek review of the magistrate's decision by the Workers Compensation Appellate Commission [("WCAC")]. Mich. Comp. Laws § 418.859(a). Finally, the decision of the WCAC is subject to judicial review [in the Michigan Court of Appeals and Michigan Supreme Court]. Mich. Comp. Laws § 418.861(a). . . .

The WDCA contains its own procedures for policing abuses of the obligations imposed to timely pay benefits. First, under Mich. Comp. Laws § 418.631(2), a self-insurer . . . can lose its privilege to self-insure if it "repeatedly or unreasonably fails to pay promptly claims for compensation for which it shall become liable." Also, under section 418.861b, the WCAC may dismiss a claim submitted for review, and assess costs and take other disciplinary action if it determines that the claim is proceeding vexatiously or was taken without a reasonable basis for believing that the claim had merit. Further, "[t]he bureau may appoint a duly qualified impartial physician to examine the injured employee and to report." Mich. Comp. Laws § 418.865.

*Brown I*, 743 F. Supp. 2d at 662–63.

We add a few observations to the general outline of the dispute resolution system that the district court provided in *Brown I*. First, employers and employees both have the ability to introduce evidence and develop a record at the initial hearing before the workers' compensation magistrate. During the hearing, the employee has the burden of proving an "entitlement to compensation and benefits . . . by a preponderance of the evidence." Mich. Comp. Laws § 418.851. The magistrate is authorized to "administer oaths, subpoena witnesses, and examine such parts of the books and records of the parties to a proceeding as relate to questions in dispute." *Id.* § 418.853; *see also* Mich. Admin. Code § 418.55 (explaining procedures for admitting and contesting evidence at a hearing); *Stokes v. Chrysler LLC*, 750 N.W.2d 129, 139–40 (Mich. 2008) (noting that "the employer has a right to discovery . . .[if] necessary for the employer to sustain its burden and present a meaningful defense," such as an interview with the claimant by a retained vocational expert); *Boggetta v. Burroughs Corp.*, 118 N.W.2d 980, 981 (Mich. 1962) (holding that an employer can be required to answer interrogatories necessary for the employee to "inquire into the facts which might or might not establish her rights to compensation"). This fact-finding authority extends to credibility determinations. *Alexander v. Covel Mfg. Co.*, 57 N.W.2d 324, 326 (Mich. 1953) ("The credit to be given the testimony of the witnesses, *and especially medical testimony when there is a conflict*, is solely for the commission's determination." (emphasis added)).

Second, the review process provides numerous opportunities for the applicant to demonstrate that an employer denied his claim through fraud.  We have already noted an employee's ability to introduce evidence supporting his claim and refuting contrary evidence advanced by the employer.  After the magistrate issues an order awarding or denying benefits, the employee and employer may appeal to the WCAC, which considers whether the magistrate's initial decision was "supported by competent, material, and substantial evidence on the whole record," Mich. Comp. Laws § 418.861a(3), "includ[ing] both a qualitative and quantitative analysis of that evidence in order to ensure a full, thorough, and fair review," *id.* § 418.861a(13).  While the Michigan Court of Appeals and Michigan Supreme Court have a more limited ability to review the facts underlying a disability determination, they may nonetheless review factual findings for fraud.  *Id.* § 418.861a(14) ("The findings of fact made by the commission acting within its powers, *in the absence of fraud*, shall be conclusive." (emphasis added)).  Even when the parties agree to settle a claim via a redemption of the employer's outstanding liability for benefits, *id.* § 418.835(1), the redemption must be approved by a magistrate who assesses whether the settlement is "just and proper under the circumstances, and is in the best interests of the injured employee," *id.* § 418.836(1)(a).  *See also Solo v. Chrysler Corp.*, 277 N.W.2d 629, 629–30 (Mich. 1979) (recognizing that an employee can bring an action to set aside a redemption if she discovers that the employer procured the redemption by fraud).  The process for disputing benefits therefore contains multiple tiers of review that are designed to prevent benefits decisions from being tainted by fraud.

## II.

With this background in mind, we now turn to the plaintiffs' allegations.  The panel opinion provides a detailed overview of the operative complaint, which we summarize briefly below. *See Jackson*, 699 F.3d at 473–75.  Because this case arises from the grant of a motion to dismiss, the court must accept the complaint's well-pled facts as true. *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012).

**A.**

Jackson injured his back while working for Coca-Cola in 2007 and began receiving workers' compensation benefits.  Both his treating physician and another physician who examined Jackson twice in 2008 at Sedgwick's request found that Jackson was disabled due to a work-related back injury.  Despite these reports, Sedgwick asked Jackson on January 6, 2009 to submit to another "independent" examination by Drouillard.  The plaintiffs assert that Drouillard was a "cut-off" doctor—that is, a doctor "who could be relied upon to lie for defendants and write a report stating a claimant did not have a work related disability regardless of the true facts"—whom Sedgwick retained to examine patients in an effort to deny compensation to deserving claimants.  After examining Jackson, Drouillard prepared a medical report for Sedgwick dated January 14, 2009, in which he claimed Jackson was not disabled.  Jackson alleges that the report's conclusion rests on numerous false assertions.  Sedgwick stopped Jackson's benefits in reliance on the report.

Jackson filed a petition for benefits with the Board of Magistrates.  *Jackson*, 699 F.3d at 474.  After the district court entered its order dismissing his complaint in this case, but before the workers' compensation magistrate ruled on the dispute between Jackson and Sedgwick, Jackson settled his claim with Sedgwick.  *Id.*

**B.**

Scharnitzke was a delivery driver for Coca-Cola.  He began experiencing pain in his left shoulder in 2004 that he claims was related to his work.  Between July 2007 and February 2008, he took a leave of absence from work that he claims was injury-related, although he did not seek workers' compensation while he was away.  An orthopedic surgeon Scharnitzke visited in August 2007 diagnosed this work-related pain as "acromioclavicular arthritis."  On March 4, 2008, Scharnitzke injured his left shoulder while lifting products up a flight of stairs.  Coca-Cola's company clinic determined that Scharnitzke had a "minor work aggravation" that qualified him for workers' compensation and sent its records to Sedgwick.  Instead of paying benefits, Sedgwick

disputed Scharnitzke's claim in a notice sent to the Board of Magistrates on March 18, 2008. Sedgwick claimed Scharnitzke's "acromioclavicular arthritis" was not work-related and maintained this position after Scharnitzke sent information from his orthopedic surgeon which supported his position that his disability was work-related. Scharnitzke alleges that Sedgwick had no genuine factual basis for this position and only took it in a bad-faith effort to deny him benefits.

On May 13, 2010, a workers' compensation magistrate awarded Scharnitzke benefits from March 5, 2008 through July 6, 2009, but rejected his application for benefits related to the time he took off between July 2007 and February 2008. *Scharnitzke v. Coca-Cola Enters., Inc.* (May 13, 2010), *available at* http://www.dleg.state.mi.us/WCA/PDFS/Opinions_051409/2010/scharnitzke. christopher.5.13.10.pdf. Scharnitzke and Coca-Cola both appealed to the WCAC. The WCAC affirmed the Board in part by only awarding Scharnitzke benefits through January 5, 2009. *Scharnitzke v. Coca-Cola Enters., Inc.*, No. 10-0061 May 11, 2011), *available at* http://www.dleg.state.mi.us/ham/wcac/11pdfa/07400061.pdf. It also dismissed Scharnitzke's appeal of the denial of benefits for the earlier time period. *Id.* Scharnitzke appealed the WCAC's ruling to the Michigan Court of Appeals, which affirmed the modification of the award and reversed the WCAC's dismissal of Scharnitzke's appeal. *Scharnitzke v. Coca-Cola Enters.*, No. 304515, 2012 WL 5193200 (Mich. Ct. App. Oct. 18, 2012). Both parties appealed to the Michigan Supreme Court. The Supreme Court reinstated the WCAC's dismissal of Scharnitzke's appeal and otherwise declined review of the case on March 27, 2013. *Scharnitzke v. Coca-Cola Enters.*, 828 N.W.2d 19 (Mich. 2013).

**III.**

This court reviews the district court's order granting the defendants' motion to dismiss *de novo*. *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012). We must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir.

2007).  The plaintiffs must "plead[] factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  If the plaintiffs do "not nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.

The district court and the defendants put forward "several grounds on which the plaintiffs' case could be dismissed, and in order to affirm the decision of the district court," we only need to recognize one of them.  *Brown II*, 675 F.3d at 969 (Gibbons, J., dissenting).  For the reasons below, the plaintiffs have failed to allege that they were "injured in [their] business or property," as is required to state a claim for a civil RICO damages action.[2]  18 U.S.C. § 1964(c).  As a result, we decline to reach the defendants' other arguments in support of the district court's judgment.

## A.

Concerns about the scope of RICO are not new.  Courts have long recognized that RICO has evolved "into something quite different from the original conception of its enactors," who sought to "supplement old remedies and develop new methods for fighting crime."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498, 500 (1985).  Nonetheless, the unexpected scope of RICO can largely be attributed to the terms of the statute itself.  Congress chose "self-consciously expansive language" when it adopted RICO, *id.* at 498, defined the "predicate acts" necessary to establish a pattern of racketeering activity broadly, *id.* at 497, 499, and directed courts to give the statute a liberal construction, Organized Crime Control Act of 1970, Pub. L. 91-452, § 904(a), 84 Stat. 922, 947.  As a consequence, courts have frequently rejected arguments that RICO

---

[2]This can also be characterized as a statutory standing issue. *Brown II*, 675 F.3d at 969 (Gibbons, J., dissenting) ("[W]ithout an allegation of damages to business or property by reason of a violation of § 1962, plaintiffs will not have standing to pursue their RICO claims."). The question of statutory standing is "analytically distinct from the question whether a federal court has subject-matter jurisdiction to decide the merits of a case." *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011). "Where a plaintiff lacks statutory standing to sue, her claim should be dismissed for failure to state a claim upon which relief can be granted . . . ." *Id.* at 581.

should be given constructions that prevent it from reaching conduct that Congress may not have intended it to reach. "[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Sedima*, 473 U.S. at 499 (internal quotation marks omitted) (quoting *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 747 F.2d 384, 398 (7th Cir. 1984)).

Nonetheless, RICO's breadth is not boundless. The text of the statute imposes genuine limitations. With respect to § 1964(c), these limits have often been derived from the similarities between RICO and the antitrust laws. The Supreme Court has "repeatedly observed that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267 (1992) (internal citations omitted). Courts have therefore looked to § 4 of the Clayton Act;[3] its predecessor, § 7 of the Sherman Act; and cases construing these statutes in order to identify limits to the civil remedy afforded by § 1964(c). For example, in *Holmes*, the Supreme Court relied on cases interpreting § 4 and § 7 to conclude that the phrase "by reason of" in § 1964(c) imposed a proximate cause requirement. *Holmes*, 503 U.S. at 265–68. Having "used the same words" to describe the civil remedy in antitrust and RICO, "we can only assume [Congress] intended them to have the same meaning that courts had already given them." *Id.* at 268.

Another limitation in § 1964(c) that has its origins in the antitrust laws is the requirement that a plaintiff be "injured in his business or property" in order to bring a civil action. While the Supreme Court has yet to definitively interpret this phrase as it appears in § 1964(c), it has construed it in the context of the antitrust laws. In *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), the Court held that "consumers who pay a higher price for goods purchased for personal use as a result of antitrust violations sustain an injury in their 'business or property'" under § 4. 442 U.S. at 334. In so doing, it rejected the respondents' argument that "the phrase 'business or property' means 'business

---

[3]"[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

activity or property related to one's business.'" 442 U.S. at 338. While conceding the breadth of its ruling that "monetary injury, standing alone, may be injury in one's 'property,'" the Court pointed out that "[t]he phrase 'business or property' also retains restrictive significance. It would, for example, exclude personal injuries suffered. Congress must have intended to exclude some class of injuries by the phrase 'business or property.'" *Id.* at 339–40 (internal citation omitted). This comment echoed historic concerns about the relationship between federal antitrust laws and the state tort system:

> [The Sherman Act] does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce. "The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb that balance is not lightly to be imputed to Congress."

*Hunt v. Crumboch*, 325 U.S. 821, 826 (1945) (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 513 (1940)).

 *Reiter* postdates RICO by nine years, and unlike the phrase "by reason of," which had a well-established meaning in the context of antitrust when Congress enacted RICO, we cannot assume that Congress agreed with *Reiter*'s interpretation of the phrase "business or property" when it modeled § 1964(c) on § 4. Nonetheless, *Reiter*'s common-sense observation about § 4 applies with equal logical force to § 1964(c). "Congress must have intended to exclude some class of injuries by the phrase 'business or property'" when it enacted RICO. *Reiter*, 442 U.S. at 339. A personal injury—that is, an injury "to a person, such as a broken bone, a cut, or a bruise" or a "bodily injury"—is different in kind from an injury to "business or property," in the sense that those terms are commonly understood. Black's Law Dictionary 857 (9th ed. 2009). This interpretation accords with our standard practice of "giv[ing] effect to all the words [in a statute] to avoid an interpretation which would render words superfluous or redundant." *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001).

 In reliance on *Reiter*, those regional circuits that have construed the phrase "business or property" have uniformly recognized that "the ordinary meaning of the

phrase 'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom." *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988) (denying civil RICO standing to FBI agents injured in a gun fight with members of a criminal enterprise).[4] This court has done likewise. *See, e.g.*, *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989). Thus, "a person physically injured in a fire whose origin was arson is not given a right to recover for his personal injuries [under § 1964(c)]; damage to his business or his building is the type of injury for which § 1964(c) permits suit." *Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 515 (2d Cir. 1984), *vacated on other grounds*, 473 U.S. 922 (1985).

## B.

At the outset, it is necessary to examine what law determines whether an injury constitutes a personal injury or an injury to business or property under civil RICO. *Brown II*, 675 F.3d at 970 (Gibbons, J., dissenting). Although "some role does exist for state law," the question of "where to set the 'business or property' threshold depends on federal statutory purpose, and that purpose is likely to support a definition that is uniform throughout the country." *DeMauro v. DeMauro*, 115 F.3d 94, 96–97 (1st Cir. 1997). Therefore, the task of this court is "to determine whether Congress intended the damages that plaintiffs seek in this case to be recoverable under civil RICO." *Grogan*, 835 F.2d at 846.

---

[4] *See also Evans v. City of Chicago*, 434 F.3d 916, 924–26 (7th Cir. 2006) (holding that damages allegedly caused by false imprisonment and wrongful prosecution fell within the "personal injury" exception); *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (*en banc*) (rejecting claim that "every loss of wages resulting from a personal injury" creates RICO liability); *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 422 (5th Cir. 2001) (precluding civil RICO claims based on "personal injury or death" from cigarette smoking); *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (concluding damage to reputation is a non-compensable "personal injury" under RICO); *Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir. 1995) ("An allegation of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property.'"); *Doe v. Roe*, 958 F.2d 763, 767–70 (7th Cir. 1992) (rejecting RICO claim for failure to allege a proper injury because the plaintiff's asserted economic losses were "plainly derivatives of . . . emotional distress" caused by her divorce lawyer coercing her into a sexual relationship "and therefore reflect personal injuries which are not compensable under RICO"); *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir. 1986) (denying RICO standing to plaintiffs claiming they were injured by exposure to toxic chemicals during their employment with the defendant). *But see Diaz*, 420 F.3d at 903–07 (Kleinfeld, J., concurring) (concluding that "[a] careful reading of [§ 1964(c)] cannot be reconciled with the 'personal injury' exclusion in the [*Doe*] and [*Grogan*] cases.").

The majority in *Brown II* recognized that personal injuries and "[a]ny pecuniary losses proximately resulting from a personal injury caused by a RICO violation, e.g. attorney fees, lost wages, and medical expenses, are . . . not recoverable." *Brown II*, 675 F.3d at 959. These losses are not recoverable because of the origin of the underlying injury. In order to explain the restrictive significance of the phrase "business or property," the *Reiter* Court distinguished a non-redressable "personal injury" from "a consumer's monetary injury *arising directly out of a retail purchase*" tainted by anticompetitive behavior. *Reiter*, 442 U.S. at 339 (emphasis added). Courts interpreting RICO have remained faithful to this distinction by excluding damages "arising directly out of" a personal injury, even though personal injuries often lead to monetary damages that would be sufficient to establish standing if the plaintiff alleged a non-personal injury. The reason why these expenses do *not* constitute an injury to property is because a personal injury does not lead to "a proprietary type of damage." *Rhoades*, 741 F.2d at 515. Although courts have used various terms to describe the distinction between non-redressable personal injury and redressable injury to property, the concept is clear: both personal injuries and pecuniary losses flowing from those personal injuries fail to confer relief under § 1964(c). *Brown II*, 675 F.3d at 969–70 (Gibbons, J., dissenting) (citing *Evans v. City of Chicago*, 434 F.3d 916, 926 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*,-- F.3d ----, 2013 WL 3942935, at *2 n.1 (7th Cir. 2013)).

The *Brown II* majority attempted to place this case outside of the personal injury exception by arguing that workers' compensation benefits, which are an "intervening legal entitlement" that arises after a personal injury, and that these benefits differ from "pecuniary losses" that flow from a personal injury. *Brown II*, 675 F.3d at 959–61. Under this theory, "[w]hen a plaintiff's personal injury is filtered through the WDCA, it is converted into a property right." *Id.* at 965. The panel relied upon *dicta* in *Evans* which recognized that a plaintiff might be able to establish a RICO claim if he could "establish that he has been unlawfully deprived of a property right in promised or contracted for wages." *Evans*, 434 F.3d at 928. It noted that *Evans* did not preclude the possibility of such a claim if the promise of benefits arose after the employee suffered a personal injury. *Brown II*, 675 F.3d at 961. The panel concluded that because the

defendants' racketeering acts had devalued this "legal entitlement," instead of causing the plaintiffs' personal injuries, it did "not make sense" to hold that the alleged damage "flowed" from the initial personal injury. *Id.*

The *Brown II* majority's characterization of the plaintiffs' claims as alleging injury to a promise of benefits or wages made after a personal injury is unpersuasive. The Michigan workers' compensation system reflects a complex set of bargains between employers and employees. It provides a framework in which the employee may obtain compensation for a "personal injury"—that is, lost wages, rehabilitation services, and medical expenses. It also allows an employer to dispute an employee's entitlement to benefits, just as the employer would be able to defend itself in a personal injury action. Even if one assumes that an employee has a "legal entitlement" to such benefits, those benefits merely reflect the pecuniary losses associated with the personal injury. By holding that the plaintiffs' asserted damages do not flow from a personal injury, the *Brown II* majority ignored the underlying reality that an award of benefits under a workers' compensation system and any dispute over those benefits are inextricably intertwined with a personal injury giving rise to the benefits.

In this case, the plaintiffs claim that they were legally entitled to receive certain benefits mandated by statute as a consequence of their personal injuries, and that they received less than they were entitled to under that system because of the defendants' racketeering conduct. But the losses they allege are simply a shortcoming in the compensation they believed they were entitled to receive for a personal injury. They are not different from the losses the plaintiffs would experience if they had to bring a civil action to redress their personal injuries and did not obtain the compensation from that action they expected to receive. Michigan's decision to create a workers' compensation system does not transform a disappointing outcome in personal injury litigation into damages that can support a RICO civil action, even if Michigan law characterizes the benefits awarded under this system as a legal entitlement. Accordingly, racketeering activity leading to a loss or diminution of benefits the plaintiff expects to receive under

a workers' compensation scheme does not constitute an injury to "business or property" under RICO.

## C.

Our interpretation of the statute is confirmed by the principle that Congress typically does not upset the established distribution of power between federal and state governments without a clear statement of its intent to do so. Concerns about federalism are particularly acute in this case, where the plaintiffs are using RICO to collaterally attack an administrative scheme created by state law to supplant personal injury tort claims. If Congress intended to recalibrate state and federal power in an area that has traditionally been the province of state government by placing federal courts in the position of reviewing a state agency's handling of charges of impropriety by parties appearing in front of it, we would expect a clear statement of Congress's intent to achieve such a result.

The leading authority on this clear-statement principle is *Gregory v. Ashcroft*, 501 U.S. 452 (1991). The plaintiffs in *Gregory* brought an Age Discrimination in Employment Act ("ADEA") challenge to a provision in the Missouri constitution that required municipal judges to retire at the age of seventy. 501 U.S. at 455. The Court held that judges were not covered by the ADEA's definition of the term "employee," which contains exclusions from its coverage that are ambiguous as to whether judges are protected by the ADEA. *Id.* at 464–67. It acknowledged that Congress "holds a decided advantage" within the Constitution's federalist structure by virtue of the Supremacy Clause, and that it "may legislate in areas traditionally regulated by the States." *Id.* at 460. Nonetheless, this power is an "extraordinary" one that "Congress does not exercise lightly." *Id.* Moreover, the claims in *Gregory* raised particularly serious federalism concerns because the appointment of judges is "a decision of the most fundamental sort for a sovereign entity." *Id.* Accordingly, the Court applied a "plain statement rule" when interpreting the ADEA in order to avoid a potential conflict between the statute and the Constitution. *Id.* at 460–61.

The *Gregory* Court relied on prior decisions invoking this interpretive canon in a variety of contexts to justify relying upon it when interpreting the ADEA.[5] To these decisions, we can add the *Hunt* and *Apex Hosiery* cases. As mentioned earlier, one of the historic concerns of courts construing the private right of action under the antitrust laws was to achieve "a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs." *Apex Hosiery Co.*, 310 U.S. at 513. Because "[t]he clearest current in [RICO's] history is the reliance on the Clayton Act model," *Sedima*, 473 U.S. at 489, we should be cognizant of federalism concerns when construing RICO, as well.

Before explaining how this rule influences our decision in this case, we must be careful to limit the rule's implications. We do not hold today that Congress is barred from enacting remedies that supplement or supplant Michigan's workers' compensation regime. The federal government is supreme under the Constitution within its sphere. Congress's powers under the Commerce Clause "can be expansive," *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2578 (2012), and as a consequence, a panoply of federal laws now govern the relationship between employer and employee. Although Michigan has the right to declare that its workers' compensation system is the exclusive remedy under *state* law for workplace injuries, *see* Mich. Comp. Laws § 418.131, it cannot exclude the federal government from providing its own remedies so long as it acts within the scope of its enumerated powers. *See Brown II*, 675 F.3d at 953–54 (collecting cases).

But to say that Congress has the power to create a particular remedy does not mean that it has actually exercised that power in a particular statute. Workers'

---

[5]*See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64–65 (1989) (concluding 42 U.S.C. § 1983 does not speak in sufficiently clear terms to abrogate a state's sovereign immunity); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985) (applying a clear statement rule to conclude that "the Rehabilitation Act does not abrogate the Eleventh Amendment bar to suits against the States"); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In [such] areas . . . the requirement of clear statement assures that the legislature has in fact faced . . . the critical matters involved in the judicial decision."); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress" when analyzing preemption questions).

compensation schemes like the one at issue in this case are designed to supplant a body of law that has always been within the domain of the states' police powers. The RICO theory advanced by the plaintiffs in this case throws the viability of these schemes into doubt by allowing any employee who believes an employer denied his workers' compensation claim through fraud to recast this dispute as a RICO claim. Moreover, there is nothing preventing an employer from turning this theory on its ear and accusing employees of a pattern of mail or wire fraud designed to *support* benefits claims. *Jackson*, 699 F.3d at 486 (Batchelder, C.J., concurring in the judgment). Although RICO is a remedial statute and it is designed to have a broad sweep, it "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt*, 325 U.S. at 826. The plaintiffs' reading of RICO would dramatically alter the "proper distribution between state and national governments of police authority and of remedies private and public for public wrongs" by making federal courts an alternative forum for workers' compensation disputes. *Apex Hosiery*, 310 U.S. at 513.

The mechanism by which this redistribution of power is brought about is equally troubling. If an employee believes that an employer has taken a meritless position about his entitlement to benefits or procured fraudulent evidence in order to support such a position, the workers' compensation scheme Michigan has established provides ample mechanisms by which the employee can contest these actions. But the plaintiffs' broad conception of injury to "business or property" creates a form of federal collateral review of the benefits process, backed up by the threat of treble damages. This is akin to giving every state court litigant a federal cause of action whenever an adversary engages in conduct that, if done in federal court, would violate Federal Rule of Civil Procedure 11. Congress might have the authority to enact such a law, but we are certain that if it intended to do so, it would have provided more explicit guidance.

To summarize, we would expect Congress to give a clear statement of its intent to intervene in Michigan's administrative system for handling workers' compensation claims. While we recognize that RICO is a remedial statute that deserves a liberal construction, it is not a means for federalizing personal injury tort claims arising under

state law. RICO lacks a clear statement of Congress's intent to effectuate such a change in the law. The absence of such a clear statement confirms our conclusion that the interpretation of § 1964(c) we adopt today is the proper one.

**D.**

Before concluding, we revisit the arguments the majority in *Brown II* made for rejecting the interpretation of § 1964(c) we adopt today.[6]

First, the majority in *Brown II* claimed that "a plain reading of the text of RICO provides no support for excluding certain categories of property interests based on how the interest itself originated" and does not "reject recovery for certain legal entitlements because they accrued following a personal injury wholly unrelated to the RICO offense at issue." *Brown II*, 675 F.3d at 960. We think it is plain that the statute does exactly this, as the Supreme Court recognized in *Reiter*, by limiting recovery to damages arising from an injury to "business or property" and, by implication, excluding recovery for damages arising from a personal injury. Plaintiffs must allege a "proprietary type of damage" to establish a RICO claim, *Rhoades*, 741 F.2d at 515, and the plaintiffs in this case have only alleged that they received less from their personal injury claim than they believed they were entitled to receive. Moreover, we cannot agree that the alleged RICO offense and the personal injury are "wholly unrelated." Michigan's workers' compensation system is a comprehensive system for the resolution of personal injury claims arising from the workplace, and disputes over those benefits cannot fairly be separated from the injury creating the entitlement to those benefits.

Second, the majority in *Brown II* contended that this interpretation of § 1964(c) "ignores the Supreme Court's instruction to interpret RICO broadly." *Brown II*, 675 F.3d at 960. But this "liberal construction" requirement, which dates back to RICO's enactment, does not exist in a vacuum. The most liberal construction of RICO's language is not always the proper one. For example, it is not evident that the terms "by reason of" in § 1964(c) import a "proximate cause" requirement into RICO civil actions,

---

[6] The dissent would reject our interpretation of § 1964(c) for the same reasons. Dissent at 13–17.

and there are more liberal ways of interpreting that phrase than the one the Supreme Court chose in *Holmes*. Nonetheless, the *Holmes* Court found that tools of statutory construction other than Congress's mandate to give RICO a liberal construction were necessary to determine the scope of the limitations Congress *did* put in the statute. We have attempted to do the same in this case.

Third, the *Brown II* majority believed that focusing on the origin of the property "would yield inconsistent results" by depriving similarly situated plaintiffs of RICO causes of action based on the nature of their injury. *Id.* at 960–61. For instance, even though the plaintiffs have no cause of action under the theory we advance today, a welfare recipient could hypothetically file a RICO action based on fraudulent devaluation of welfare benefits, because that injury is not a "personal injury." *Id.* Assuming this is true, the inconsistency is not a sign of bad statutory construction, but "the natural result of the [c]ongressional definition of injuries within the statute's reach." *Id.* at 970 n.2 (Gibbons, J., dissenting). Long before this case, courts recognized that the "business or property" limitation in § 1964(c) created a distinction between compensable and non-compensable injuries that some might consider arbitrary. *Rhoades*, 741 F.2d at 515 (recognizing that damages to a building caused by arson would be compensable under RICO, but personal injuries sustained during an arson would not). The question here is not whether Congress drew such a line when it imported the "business or property" limitation from antitrust to RICO—every court that has examined this issue agrees that it did—but where that line is. Line-drawing of this sort inevitably creates results that could be deemed inconsistent, but the existence of such inconsistencies does not demonstrate that the statute has been misconstrued.

## V.

For these reasons, we affirm the judgment of the district court.

———————————

**CONCURRENCE**

———————————

CLAY, Circuit Judge, concurring in the judgment. The clear statement rule "implies a special substantive limit on the application of an otherwise unambiguous mandate." *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 141 (2005) (plurality opinion). The rule provides that "[i]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985)). Undoubtedly, as the dissent points out, the phrase "injured in [one's] business or property" in the context of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1964(c), is unambiguously broad. Dissent at 26. The question is whether Congress intended this broad but nondescript phrase to reach the specific injuries that Plaintiffs assert. Although the dissent is in many ways persuasive, its failure to adequately address the majority's application of the clear statement rule prevents me from joining it. Because I find no clear statement that Congress intended RICO to reach Plaintiffs' injury, I would affirm the district court's dismissal of Plaintiffs' complaint, and accordingly, I concur in the result reached by the majority.

Plaintiffs' claimed injury is somewhat novel. They allege that Defendants Coca-Cola and Sedgwick Claims Management Services engaged Defendant Dr. Paul Drouillard "as a 'cut-off' doctor to provide false medical reports" as part of a "fraudulent scheme involving the mail" to "deprive" Plaintiffs of their Michigan workers' compensation benefits. *Jackson v. Segwick Claims Mgmt. Servs.*, 699 F.3d 466, 473 (6th Cir. 2012). I agree with the dissent that Michigan law would regard as an injury to Plaintiffs' property the allegedly fraudulent interference with Plaintiffs' ability to make a claim for Michigan workers' compensation benefits and have that claim fairly adjudicated. Dissent at 31 n.5 (citing *Williams v. Hofley Mfg. Co.*, 424 N.W.2d 278 (Mich. 1988)).

I further agree with the dissent that the majority's emphasis on the coincidence between the personal injury and the injury to Plaintiffs' claim for benefits leads the majority to embrace an imprecise and atextual standard from our sister circuits.  *See* Dissent at 31–32.  While it seems undisputed that RICO liability will not attach where the injuries alleged are personal ones, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989), there is no textual reason to extend that bar where plaintiffs allege an injury to property for which a personal injury was a necessary precursor.  As the dissent notes, "RICO is to be read broadly . . . [and] liberally construed to effectuate its remedial purposes."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985) (internal quotation marks omitted); *see also* Dissent at 25.  Following the rule laid out in *Evans v. City of Chicago*, 434 F.3d 916 (7th Cir. 2006), that "pecuniary losses flowing from . . . personal injuries are insufficient to confer standing under § 1964(c)," the majority ignores the true nature of Plaintiffs' claimed injury, which is a harm to their ability to bring a claim for workers' compensation and have that claim fairly adjudicated.  *See* Maj. Op. at 12–15 & n.4.  In doing so, the majority paints with too broad a brush, categorically disclaiming  the potential for RICO liability based on the mere fact that Plaintiffs were personally injured *in addition to* being injured in their property.  Such a construction finds no support in the broad and unambiguous text of RICO, and I cannot endorse it.

Since "there is nothing in the text of RICO or the cases they point to that provides for ignoring damage to an intervening legal entitlement because it arose following a personal injury," Dissent at 34, the basis for the majority's extension must lie elsewhere.  It is clear that the majority is concerned about the dissent's analysis increasing the number of RICO claims filed,[1] and further, that those claims will upset the balance struck by the Michigan legislature in enacting its workers' compensation

---

[1] It is not as if every claimant who is denied workers' compensation benefits will be able to file suit.  The pleading standards enunciated in *Twombly* and *Iqbal*, as well as the specificity requirements of Federal Rule of Civil Procedure 9(b) and RICO itself impose real obstacles to plaintiffs converting an unfavorable determination by Michigan's Workers' Compensation Agency into a federal RICO case. *See 16630 Southfield Ltd. P'ship v. Flagstar Bank, FSB*, --- F.3d ----, 2013 WL 4081909, at *2 (6th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *In re ClassicStar Mare Lease Litig.*,--- F.3d ----, 2013 WL 3746220, at *6–7 (6th Cir. 2013) (discussing RICO's pleading requirements).

scheme. *See* Maj. Op. at 17; *see also Jackson*, 699 F.3d at 486 (Batchelder, C.J., concurring in the judgment). But the fact that the majority may disagree with Plaintiffs' use of RICO also cannot justify reading out property injuries that coincide with personal injuries from RICO's broad sweep. However, neither can the dissent's repeated invocation of the Supreme Court's statement in *Sedima* that "RICO is to be read broadly," 473 U.S. at 497, wholly resolve this case. Because RICO's text is broad and unambiguous, any limitation of its scope must arise externally. In this case, because Plaintiffs' alleged property interests deal with a traditional area of state power, the clear statement rule operates to substantively limit a construction of RICO that would interfere with that state power. *See Spector*, 545 U.S. at 141.

This Court has recognized that "workers' compensation is clearly one of the state's traditional areas of authority." *Saylor v. Parker Seal Co.*, 975 F.2d 252, 256 (6th Cir. 1992). Where a federal statute can be construed in a way that would "intru[de] into traditional state authority," the clear statement rule requires that we, as a court, find not only breadth but also clearly expressed congressional intent for such an intrusion. *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (plurality opinion). "[T]he clear statement principle reflects 'an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.'" *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 544 (2002) (quoting *Gregory*, 501 U.S. at 461).

Contrary to the dissent's implication, the clear statement rule is not confined to a few limited contexts. *See* Dissent at 39–40 ("[T]he majority makes the erroneous assumption that the clear-statement rule would even apply in this context."). In addition to the cases collected by the majority, *see* Maj. Op. at 15–16 & n.5, there is a raft of more recent cases and contexts in which the clear statement rule has been applied. *See, e.g.*, *Spector*, 545 U.S. 119 (Americans with Disabilities Act); *Raygor*, 534 U.S. 533 (supplemental jurisdiction); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) (Clean Water Act); *Cleveland v. United States*, 531 U.S. 12 (2000) (criminal RICO). Analogous to the present case, in *Rapanos*, the Supreme

Court was tasked with interpreting the phrase "the waters of the United States" as used in the Clean Water Act.  547 U.S. at 730–31 (plurality opinion).  After recognizing that "[r]egulation of land use . . . is a quintessential state and local power," the Court rejected the expansive reading of "the waters of the United States" urged by the government because such a reading "would authorize the [Army] Corps [of Engineers] to function as a *de facto* regulator of immense stretches of intrastate land . . . ."  *Id*. at 737–38.  If Congress had intended such a result, the Court said that it would "ordinarily expect a 'clear and manifest' statement from Congress" indicating such an intention.  *Id*. at 738 (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994)).

Similarly, in this case, adopting the dissent's reading of RICO could require us to act as a "*de facto* regulator" of Michigan's (and likely other states') workers' compensation scheme.  Arguably, the federal courts would be permitted to entertain RICO causes of actions to ensure a fraud-free workers' compensation scheme.  While this may be a worthy goal, had Congress intended for us to police these state regulatory schemes, which were enacted to avoid resort to traditional courts, *see American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 44 (1999), it would in all likelihood have spoken more clearly.[2]  Therefore, because § 1964(c) contains no clear statement evidencing Congress' intent for the federal courts to wade into overseeing state workers' compensation regimes, a traditional area of state purview, I would find that although Michigan law recognizes Plaintiffs' injury as one implicating a property interest, the injury does not "rise[] to the level of 'business or property'" for purposes of RICO. *DeMauro v. DeMauro*, 115 F.3d 94, 96 (1st Cir. 1997).

I therefore concur in the judgment.

---

[2]The question of whether Congress possesses the power to regulate in this sphere under the Commerce Clause, or otherwise, and whether Congress could, through the Supremacy Clause, displace Michigan's intention for its workers' compensation scheme to be the exclusive remedy for on-the-job injuries is distinct from the question of whether Congress did, in fact, do so in enacting RICO. *See* Maj. Op. at 16.

_____

**DISSENT**

_____

KAREN NELSON MOORE, Circuit Judge, dissenting.    The Racketeer Influenced and Corrupt Organizations Act ("RICO") entitles individuals who have been "injured in [their] business or property by reason of" racketeering to treble damages, costs, and fees.  18 U.S.C. § 1964(c).  Clifton Jackson and Christopher Scharnitzke (collectively, "the employees") allege that they were injured in their property when Sedgwick Claims Management Services, Inc., Coca-Cola Enterprises, Inc., and Paul Drouillard (collectively, "the defendants") conspired to deny fraudulently or to terminate fraudulently benefits to which they were entitled pursuant to Michigan law.  Notwithstanding the fact that Michigan has recognized these benefits as statutory entitlements and that these statutory entitlements in turn constitute a property interest, the majority concludes that the employees have failed to state a claim under RICO because they have not alleged an injury in their property.

The most striking aspect of the majority opinion, though, is the way in which it evades entirely any discussion of the property interest that the employees allege in their complaint as the injury they suffered under RICO.  Instead, the majority reaches its conclusion by analyzing certain personal injuries that the employees do not allege form the basis of their RICO claim.  Because I believe that we must accept a plaintiff's allegations as true on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and because the employees here have alleged an injury in their property, I cannot agree with the majority's analysis or reach its conclusion.  I respectfully dissent.

## I.  INJURY TO PROPERTY

The primary issue in this appeal is whether the employees have alleged an injury in their business or property within the meaning of RICO.  In determining that they have

not,[1] the majority chooses to ignore the fact that the employees have alleged an injury to a legal entitlement, and therefore, to property, and instead focuses on the irrelevant fact that the employees also suffered a personal injury. I fail to see support for the majority's analysis and believe that the employees have alleged an injury to property—Jackson, by alleging fraudulent termination of his worker's compensation benefits, and Scharnitzke, by alleging the fraudulent devaluation of his expectancy of worker's compensation benefits. For the reasons stated below, I would allow the employees' claims against the defendants to proceed.

## A. Background

Title 18 U.S.C. § 1964(c) entitles those who have been "injured in [their] business or property by reason of" racketeering, among other actions, to treble damages, costs, and fees. A plaintiff can recover under § 1964(c) only if he or she can demonstrate an injury to "business or property." Shaping the analysis of this provision is the Supreme Court's instruction that "RICO is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985). The Supreme Court justified that rule in two ways. First, Congress wrote the RICO statute with "self-consciously expansive language and overall approach." *Id.* at 498 (citing *United States v. Turkette*, 452 U.S. 576, 586–87 (1981)). Second, Congress "express[ly] admoni[shed] that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Id.* (quoting Pub. L. No. 91-452, § 904(a), 84 Stat. 947). The remedial purpose of RICO is "nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Id.*

## B. State Or Federal Law

Whether a person has a "property" interest is traditionally a question of state law. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law."). For that reason, "'[i]njury to property' for RICO purposes is generally determined by state law." *Isaak v. Trumbull*

---

[1]The majority cryptically refers to statutory standing in its footnote 2. In light of the majority's failure to articulate or apply any principles relating to standing, this dissent focuses on the majority's holding that the plaintiffs failed to allege a claim of injury to their business or property.

*Sav. & Loan Co.*, 169 F.3d 390, 397 (6th Cir. 1999) (citing *DeMauro v. DeMauro*, 115 F.3d 94, 96 (1st Cir. 1997)).  We have never fleshed out the circumstances under which state law is not determinative of whether someone has a property interest at stake, but several of our sister circuits have suggested that federal law can constrict state definitions of property.  In *DeMauro*, for example, the First Circuit stated that "one might expect federal law to decide whether a given interest, recognized by state law, rises to the level of 'business or property,'" a question that "depends on federal statutory purpose."  *DeMauro*, 115 F.3d at 96; *see also Evans v. City of Chicago*, 434 F.3d 916, 930 n.25 (7th Cir. 2006) ("[W]e need not adopt a state law definition of 'business or property' which is so broad that it contravenes Congress' intent in enacting the RICO law."); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("[E]ven though courts may look to state law to determine, for RICO purposes, whether a property interest exists, it does not follow that any injury for which a plaintiff might assert a state law claim is necessarily sufficient to establish a claim under RICO.") (internal footnote omitted); *cf. Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005) (invoking the same rule when deciding whether property is protected under the Due Process Clause).

Under this view, a court must ask both whether Michigan defines the interest at stake as property and whether such a definition is consistent with the concept of property that Congress protected in enacting RICO.  The majority, however, has chosen to ignore the former.  In fact, the majority does not even acknowledge that the employees have alleged injury to a property interest as recognized under Michigan law.  Because it is necessary to decide whether there is a property interest at stake and define it accurately prior to determining whether that property interest is recognized under RICO, I will address each inquiry in turn.

## C.  Property Interest Under Michigan Law

The First Amended Complaint identifies the employees' injuries as including the fraudulent termination and denial of worker's compensation benefits that they were due pursuant to the Michigan Worker's Disability Compensation Act ("WDCA").  Specifically, Jackson alleges that the defendants conspired to terminate fraudulently

benefits that he had been receiving, and Scharnitzke alleges that the defendants conspired to deny him fraudulently benefits that he was due. R. 2 (First Am. Compl. at 18–21) (Page ID #41–44). Because Michigan's nondiscretionary worker's compensation scheme creates a property interest in the continued receipt of statutory benefits as well as in the expectancy of statutory benefits following notice to the employer of injury, I cannot agree with the majority's characterization of the interest at issue as relating only to a personal injury.

Both Michigan law and federal law recognize that the recipient of a statutory entitlement "has a statutorily created property interest in the continued receipt of those benefits." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 60 (1999) (citing *Goldberg v. Kelly*, 397 U.S. 254, 262 & n.8 (1970)); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *Logan*, 455 U.S. at 428; *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *see also Williams v. Hofley Mfg. Co.*, 424 N.W.2d 278, 282, 283 n.16 (Mich. 1988) (relying on federal due process law articulated in *Logan*, 455 U.S. at 428). A recipient of Michigan worker's compensation benefits undoubtedly has a property interest under state law in the continued receipt of those benefits. Jackson has therefore alleged a property interest in the continued receipt of his worker's compensation benefits under Michigan law. Because Scharnitzke's allegations center on the fraudulent denial of benefits as opposed to the fraudulent termination of benefits, the next issue is whether an injured employee obtains a property interest in his *expectancy* of worker's compensation benefits. For the reasons explained below, I would hold that an employee obtains a property interest at the time the employer becomes aware of the injury.

Michigan has not directly addressed at what point an injured employee has a property interest in the benefits provided by the WDCA. In construing other statutes, Michigan courts have held that "a unilateral expectation of [a statutory] benefit" before the benefit is awarded is not property because the claimant must "have a legitimate claim of entitlement to the funds." *City of St. Louis v. Mich. Underground Storage Tank Fin. Assurance Policy Bd.*, 544 N.W.2d 705, 708–09 (Mich. Ct. App. 1996) (citing *Williams*,

424 N.W.2d 278).  However, that principle originates in federal due process law.[2] *Castle Rock*, 545 U.S. at 756 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).  And when interpreting federal due process law, "[e]very regional circuit to address the question," including the Sixth Circuit, "has concluded that applicants for benefits, no less than benefits recipients, may possess a property interest in the receipt of public welfare entitlements," *Cushman v. Shinseki*, 576 F.3d 1290, 1297 (Fed. Cir. 2009) (internal quotation marks and alteration omitted), so long as "a statute mandates the payment of benefits to eligible applicants based on objective, particularized criteria," *Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996); *see also Hamby v. Neel*, 368 F.3d 549, 559 (6th Cir. 2004); *Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir. 1996).[3]

Federal due process law therefore recognizes a property interest in benefits that have not yet been awarded if the party asserting the property entitlement can "point to some policy, law, or mutually explicit understanding that both confers the benefits and limits the discretion of the [other party] to rescind the benefit." *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 435 (6th Cir. 2005) (internal quotation marks omitted); *see also Castle Rock*, 545 U.S. at 756 ("[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion.").  Michigan law is consistent with this approach.  For example, the Michigan Supreme Court has held that a bar owner with a liquor license has a property interest in his expectancy of receiving a renewal license, independent of his interest in his existing license, despite having had no property interest in his expectancy of an initial license in the first place.  *Bundo v. City of Walled Lake*, 238 N.W.2d 154, 160 (Mich. 1976).  The Michigan Supreme Court

---

[2]Michigan often looks to federal due process law in analyzing whether property interests are at stake.  *Williams*, 424 N.W.2d at 282, 283 n.16 (relying on federal due process law articulated in *Logan*, 455 U.S. at 428).

[3]"The Supreme Court has repeatedly reserved decision on the question of whether *applicants* for benefits (in contradistinction to *current recipients* of benefits) possess a property interest protected by the Due Process Clause."  *Kapps v. Wing*, 404 F.3d 105, 115 (2d Cir. 2005).  Nevertheless, "the Supreme Court's procedural due process jurisprudence focuses on whether statutory provisions create a right, not whether benefits have been received in the past."  *Mallette*, 91 F.3d at 640 (citing *Roth*, 408 U.S. at 577).  "[T]he potential consequences of denying . . . benefits are no less potentially dire than those of revoking them."  *Id.*

focused entirely on the differences in the statutory procedures for obtaining a renewal license as compared to an initial license. An initial applicant for a liquor license must obtain approval from the local legislative body *before* the license may be granted; the initial applicant therefore has nothing more than a unilateral expectation or hope that he may receive the license. An existing licensee need not obtain such approval; unless an objection by the local body is filed prior to thirty days before his license expires, renewal "take[s] place as a matter of course." *Id.* at 157, 161.

Upon application of this principle to the present context, the statutory procedures for obtaining worker's compensation benefits in Michigan indicate that applicants for worker's compensation benefits have a property interest in those benefits at the time that their employer becomes aware of the injury. The WDCA's mandatory language deprives the Worker's Compensation Appellate Commission ("WCAC") of discretion about whether to award benefits. The statute says that employees injured in the course of employment "*shall* be paid compensation," which is calculated according to a rigid schedule. MICH. COMP. LAWS § 418.301(1) (emphasis added); *see also Reed v. Yackell*, 703 N.W.2d 1, 7 (Mich. 2005) (referring to the WDCA process and the employer's assumption of responsibilities as "automatic").

Moreover, there is no "well established tradition" of government officials having "discretion" despite "apparently mandatory . . . statutes" in the context of the WDCA. *Castle Rock*, 545 U.S. at 760. In fact, no adjudication is required: an employee receives worker's compensation benefits fourteen days "after the employer has notice or knowledge of the disability." MICH. COMP. LAWS § 418.801(1). Applicants therefore acquire a property interest in worker's compensation when employers learn of their employees' physical injuries. The property interest has an "ascertainable monetary value" and the identity of the entitlement is neither indeterminate nor vague. *Castle Rock*, 545 U.S. at 766 (internal quotation marks omitted). These features demarcate a property interest guaranteed by the mandatory language of the WDCA.

The defendants argue that the employer's statutory ability to dispute the payment of benefits negates any claim of legal entitlement to benefits prior to a decision to award

them. As an initial matter, the defendants misread § 418.801(2) as permitting the nonpayment of otherwise mandatory weekly compensation in the event of an ongoing dispute. It does not. Subsection (2) relieves an employer of an otherwise automatic *penalty* for the non-payment of the benefits owed under the statute in the event of an ongoing dispute. But even if it did relieve the employer of its obligation, the existence of a limited mechanism to dispute the receipt of benefits otherwise awarded as a matter of course does not make the expectation cease to be a property interest.[4] In *Bundo*, for example, the Michigan Supreme Court deemed it of no consequence that the local legislative body retained a statutory right to object to renewal of a liquor license. 238 N.W.2d at 160–61.

The absence of a specific statutory provision authorizing an employer not to pay compensation during a dispute also distinguishes this case from *American Manufacturers*. In *American Manufacturers*, the Supreme Court held that claimants of worker's compensation benefits in Pennsylvania did not have a property interest in the payment of benefits prior to an adjudication that the medical treatments for which they sought compensation were "reasonable and necessary." 526 U.S. at 61. In 1993, Pennsylvania had amended its worker's compensation laws to insert a procedure by which an employer could require a review of the necessity of an employee's treatments "before a medical bill must be paid." *Id.* at 45. The Supreme Court held that under the new regime, it was no longer enough that the plaintiffs demonstrated their "initial *eligibility* for medical treatment" because they had not overcome the second statutory hurdle of showing "that the particular medical treatment they received was reasonable and necessary." *Id.* at 61. The injured employees therefore could not yet claim a property interest in their expectation of benefits. *Id.*

Here, the underlying Michigan state law does not require injured employees to make such an initial showing *before* they receive benefits, as Pennsylvania's law did.

---

[4]Otherwise a party could *never* be denied benefits, even for proper grounds, which is clearly not the case. The ability of an employer to dispute an otherwise nondiscretionary claim of benefits, and such employer's potential success, impacts only the value of the employee's claim to benefits, not the determination that such an expectancy of benefits is the employee's property in the first place.

In contrast, Michigan law resembles the old Pennsylvania regime, stating simply that "[a]n employee[] who receives a personal injury arising out of and in the course of employment by an employer . . . *shall be paid compensation* as provided in this act." MICH. COMP. LAWS § 418.301(1).  Although an employee bears the burden of showing that his personal injury arose during the course of his employment in the event of a dispute, no Michigan statutory provision permits the employer to withhold compensation until such a showing has been made.  MICH. COMP. LAWS § 418.851.

Where, as here, the receipt of the benefit is nondiscretionary and statutorily occurs as a matter of course, I firmly believe that the Michigan courts would recognize a property interest in an injured employee's expectancy of worker's compensation.[5] Because Scharnitzke has alleged that he was denied benefits that he was due under the WDCA's mandates, I would hold that he has alleged a property interest cognizable under RICO.

## D.  Property Interest Under RICO

Because Michigan has created a property interest in the continued receipt of worker's compensation benefits, as well as in the expectancy of those benefits, I will now turn to whether these statutory entitlements constitute an injury to property within the meaning of RICO.  The majority concludes that even if these were statutory entitlements under Michigan law, they are not cognizable for the purposes of RICO, relying on a misplaced belief that neither Jackson nor Scharnitzke can recover under RICO because the property interest they seek to vindicate relates in some manner to a personal injury.  I use the phrase "relate in some manner to" because the majority has failed to provide us with a standard on this point.  Rather, it employs eight different

---

[5]I would also note that Michigan has recognized a property interest in a party's cause of action before the WDCA.  Michigan law describes a cause of action for worker's compensation as a "species of property"—for both the plaintiff and the defendant. *Williams*, 424 N.W.2d at 282, 283 & n.16 (citing *Logan*, 455 U.S. at 428).  Specifically, Michigan has explained that a party has a property interest in a worker's compensation cause of action such that a failure to afford a party adequate process in such a proceeding injured its property.  A claim based on deception before the WCAC that deprived a party of the ability to assert his or her claim for benefits under the statute in a fair forum would therefore constitute an injury to property under RICO.  And as discussed throughout, I see no reason to exclude injuries to causes of action, which are indisputably injuries to property, from the category identified by Congress as "property" in RICO.

formulations to describe the relationship between the personal injury and the injury to property, including "flow from," "arising directly out of," and "associated with," without specifying which it considers to be the standard. Maj. Op. at 13–15. Given that many of these phrases have distinct meanings under our precedent, this ambiguity will likely cause confusion in the future.

Relatedly, I find it troubling that the majority assumes for the sake of its opinion that the employees have alleged legitimate statutory entitlements, yet does not even define the type of interest that this creates under Michigan law. It seems impossible to assert that RICO does not include an interest if one has not even attempted to define or categorize the interest at issue. I thus find the majority's position—that RICO, which specifically protects against injuries to property, does not protect against an assumed undefined injury to property because it relates in some undefined manner to a personal injury—to be unsatisfactory. Although the law is quite clear that a plaintiff cannot bring a RICO action where the injury alleged is a personal injury, no court has ever held that a plaintiff cannot bring a RICO action where the injury alleged is an injury to property because that plaintiff has also suffered a personal injury upon which the plaintiff has made no legal claim. That the majority fails to see this distinction renders its analysis unpersuasive. For the reasons articulated below, I would hold that injury to the statutory entitlements alleged by the employees in this case is an injury to property within the meaning of RICO.

Congress provided in 18 U.S.C. § 1964(c) that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." The statute offers no further guidance on the meaning of "business or property." When faced with interpreting similar language in the context of the Clayton Act, the Supreme Court acknowledged that the inclusion of the word "business" works to narrow the definition of "property" from its otherwise naturally broad meaning. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). "Congress must have intended to exclude some class of injuries by the phrase 'business or property.'" *Id.* at 339. This construction is equally applicable to the

language in RICO. For example, money is a species of property under state law, but to hold that all monetary losses are covered by RICO would render the word "business" superfluous. Therefore, whereas damage to a building is an obvious property injury, purely pecuniary losses are sometimes indicative of property injury and sometimes not, depending on whether the pecuniary loss is to a legal entitlement—i.e., property. *See id.* at 340 ("[T]he fact that petitioner [] was deprived of only money, albeit a modest amount, is no reason to conclude that she did not sustain a 'property' injury.").

Against this backdrop, we have held that "[r]ecovery for physical injury or mental suffering is not allowed under civil RICO because it is not an injury to business or property." *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989), *cert. denied*, 493 U.S. 1074 (1990); *see also Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir. 1986); *Evans*, 434 F.3d at 930–31; *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988), *cert. denied*, 488 U.S. 981 (1988). The Supreme Court similarly excluded recovery for purely personal injuries under the Clayton Act, as such injuries are not inherently injury to any entitlement we would deem property. *Reiter*, 442 U.S. at 339. Any pecuniary losses proximately resulting from a personal injury caused by a RICO violation—e.g. attorney fees, lost wages, and medical expenses—are also not recoverable because they, too, do not implicate harm to any legal entitlement.[6]

The defendants and the district court focus on language in these cases rejecting pecuniary losses "flowing from" personal injuries to argue that any pecuniary losses downstream from a personal injury are categorically personal in nature and unrecoverable under RICO. *See, e.g.*, *Evans*, 434 F.3d at 926. The majority seems to reject the use of the term "flowing from," yet does not offer a definitive replacement. In any event, by focusing on the personal-injury aspect of this case, in whichever capacity they have chosen, the defendants, the district court, and the majority skip over

---

[6]However, there is some inconsistency among courts when the injury claimed as a result of the RICO violation includes lost wages, but this is in part because some states do recognize a legal entitlement to employment opportunities. *Compare Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc) (lost wages from wrongful death caused by RICO violation may be properly pleaded as a property interest given California law), *with Evans*, 434 F.3d at 930–31 (lost wages from wrongful incarceration caused by RICO violation not property interest given Illinois law).

the first and most fundamental question at issue—has any legal entitlement been harmed. They are correct that "but for" the personal injury, the employees would have had no interest in any benefits. But there is nothing in the text of RICO or the cases they point to that provides for ignoring damage to an intervening legal entitlement because it arose following a personal injury. In fact, the majority opinion makes the Sixth Circuit the first to read RICO as preventing recovery for injuries to property "by reason of" a RICO violation solely because the property interest itself would not have existed but for a personal injury. This is incorrect for three reasons.

First, a plain reading of the text of RICO provides no support for excluding certain categories of property interests based on how the interest itself originated. Recognizing statutory entitlements as property under RICO does not render any term of the act superfluous. *See Reiter*, 442 U.S. at 338–39. Nor does the text reject recovery for certain legal entitlements because they accrued following a personal injury. Congress's only other express limitation is that the injury to property must be "by reason" of a § 1962 violation; the text narrows recovery based on the origin of the *injury*, not the origin of the property. Based on the plain language of § 1964, I see no reason to exclude statutory entitlements to worker's compensation benefits—which are recognized as property under state law—from the category protected by RICO.

Second, focusing on the predicate injury that gave rise to the property interest ignores the Supreme Court's instruction to interpret RICO broadly. Section 1964 places "no restrictions . . . on the words 'injured in his property.' The statute does not limit standing to those 'directly injured in his property,' or 'injured only in his property.'" Comment, Patrick Wackerly, *Personal Versus Property Harm and Civil RICO Standing*, 73 U. CHI. L. REV. 1513, 1520–21 (2006). "To the contrary, the language reads that 'any' injured party has standing to sue." *Id.* at 1521. The Supreme Court has repeatedly refused to graft additional requirements onto the plain language of both this statute and the identical language in the Clayton Act when doing so would defeat Congress's intent that the statute have broad and inclusive application. *See Reiter*, 442 U.S. at 339 (rejecting argument that Clayton Act requires injury to commercial property interests);

*Sedima, S.P.R.L.*, 473 U.S. at 497 (rejecting argument that RICO applies only to organized crime). The majority urges a narrow reading of the word "property," but points to nothing in the text of RICO or statements of Congress to justify that approach. Because Congress intended us to interpret RICO broadly, *Sedima, S.P.R.L.*, 473 U.S. at 497, I see no reason to preclude RICO suits that are based on injury to property, not the predicate physical injury that gave rise to the property interest in the first place.

Third, such an approach would yield inconsistent results. The majority does not argue statutory entitlements or claims to benefits generally are not property under RICO, but rather that such interests constitute property only when the underlying wrong to be vindicated is an injury to business or property. Such an approach means that a plaintiff could recover under RICO for the fraudulent devaluation of welfare benefits, which do not arise following a personal injury, but not for the fraudulent devaluation of worker's compensation benefits, solely because the latter do. A plaintiff could recover for the loss of a cause of action for wrongful termination, but not for the loss of a cause of action for wrongful death. Nothing in the text of RICO evinces an intent by Congress to draw such arbitrary distinctions among property interests, nor do we find any support for the exclusion of these claims from the protections of RICO. Such an approach is incompatible with RICO because it qualifies the term "property" without a basis to do so in the RICO statute. *See Reiter*, 442 U.S. at 338–39 (rejecting interpretation of "business or property" as "business or business property"). Classifying property injuries according to their origins creates untenable distinctions.

Moreover, to the extent the majority relies on the "flowing from" standard, it makes the same mistake that the district court did by misconstruing the meaning of language from our sister circuits that "pecuniary losses *flowing from* [personal] injuries" are insufficient to establish injury to property. *Evans*, 434 F.3d at 930 (emphasis added); *see also Grogan*, 835 F.2d at 847. Neither of these cases involved an injury to an intervening legal entitlement. Both addressed whether various damages that were the proximate result of a personal injury caused by a RICO violation, albeit some more indirectly than others, could be deemed property interests *on their own*. *Evans*, 434 F.3d

at 930 (lost wages from wrongful incarceration caused by alleged RICO violation not property); *Grogan*, 835 F.2d at 846–47 (economic losses from wrongful death caused by alleged RICO violation not property). I take no issue with their holdings that they could not. *Evans* even left open the possibility that a plaintiff might be able to "recover under RICO for loss of an employment opportunity" if "an employee is able to establish that he has been unlawfully deprived of a property right in promised or contracted[-]for wages." 434 F.3d at 928. The *Evans* court did not say it would permit recovery for such a property deprivation *only if the promise of wages did not arise following a physical injury at work*. Such a scenario involving harm to an intervening legal entitlement, separating the physical injury from the downstream pecuniary losses, would be more factually analogous to this case than the actual facts of *Evans* are. Focusing on whether pecuniary losses "flowed"[7] in some way from a personal injury does not make sense in cases involving the devaluation of an actual legal entitlement as the result of an independent RICO fraud.

For these reasons, I would conclude that the devaluation or loss of a statutory entitlement is an injury to property within the meaning of RICO. Because Jackson alleged that he had started receiving worker's compensation benefits under Michigan law prior to the defendants' decision to terminate those benefits, it is undeniable that he has a statutory entitlement to these benefits. The majority is incorrect to distinguish this statutory entitlement from all others on the faulty reasoning that all injuries related to a personal injury are outside the scope of RICO. Likewise, Scharnitzke has alleged that he was denied fraudulently the nondiscretionary worker's compensation benefits that he was due under Michigan law. That he could not have incurred these benefits but for a personal injury suffered at work does not change their legal status. Under longstanding principles, Jackson and Scharnitzke have each alleged that they have suffered an injury to property.

---

[7]Additionally, I am concerned that the language "flowing from" is vague. It certainly cannot require dismissal of any civil RICO claim that can be traced to a personal injury, as even *Grogan* concedes: "Without ruling on hypothetical cases, we can conceive of injuries resulting from murder for which recovery would be possible that do not involve issues such as loss of earnings and loss of support that are part of many personal injury claims." 835 F.2d at 848.

## II. SUPREMACY CLAUSE

The majority spends much time addressing its concern that allowing plaintiffs to bring civil RICO actions based on allegations of fraudulent denials and terminations of benefits would impair the WDCA's regulatory scheme or the remedies set forth therein. Although the majority recognizes that Michigan cannot declare its regulatory scheme exclusive of federal remedies because of the Supremacy Clause, it nonetheless places undue significance on the nature of this scheme. Specifically, the majority concludes that because Congress has not expressly stated its intent to allow for remedies supplemental to Michigan's exclusive scheme and because civil RICO actions do not include "all torts," the employees' claims must fail. Maj. Op. at 17. The flaw with the majority's arguments on these points, however, is that the predicate offense for the RICO action is mail fraud, not the denial of worker's compensation or a personal injury. The fact that the majority refuses to recognize the correct predicate offense leads it to engage in a tangential analysis relating to principles not at issue on this case. For this reason, I will focus my analysis in this section on the basic principles of RICO predicate offenses and the supremacy of federal law.

"The gravamen of [a] RICO cause of action is not the violation of state law, but rather certain conduct, illegal under state law, which, when combined with an impact on commerce, constitutes a violation of federal law. Therefore, it is not alleged that [the defendants are] subject to 'liability under' [state law]; their liability . . . stems from RICO." *Williams v. Stone*, 109 F.3d 890, 895 (3d Cir.), *cert. denied*, 522 U.S. 956 (1997). Under the Supremacy Clause, "the relative importance to the State of its own law is not material" when "a valid federal law" provides a cause of action based on overlapping facts. *Ridgway v. Ridgway*, 454 U.S. 46, 54 (1981) (internal quotation marks and alteration marks omitted).

Although RICO's predicate of mail fraud is similar to the underlying fraud that affects a state-recognized interest, mail fraud is a distinct offense. Due to the Supremacy Clause, as recognized by the majority, Michigan does not have the authority to declare

a state remedy exclusive of federal remedies.[8]  *See* U.S. Const. art. VI, cl. 2; *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1105 (10th Cir. 1998) ("If Roadway means to argue that Colorado's Workers' Compensation Act provides the exclusive remedy for all work-related injuries including emotional distress caused by violations of the civil rights laws, that argument is readily disposed of by the Supremacy Clause."); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1190 (2d Cir. 1987) ("New York's Workers' Compensation Law might bar plaintiff's state common-law claim . . . [, but] we do not read the workers' compensation law to deny relief under a federal statute.  Were state law to erect such a bar, it would clearly run afoul of the Supremacy Clause . . . .") (internal citations omitted).  State law can eliminate federal remedies only when authorized by reverse-preemption clauses, such as the one contained in the McCarran-Ferguson Act, which played a role in our court's decision in *Brown v. Cassens Transport Co.*, 546 F.3d 347, 357 (6th Cir. 2008).

Admittedly, the employees are entitled to damages for the alleged fraud only if they were actually entitled to worker's compensation and were not properly compensated, which is a question of state law.  But this fact shows an overlap in sanctioned conduct, not a dependency relationship between state and federal law.  It is well established that "[t]he fact that a scheme may violate state laws does not exclude it from the proscriptions of the federal mail fraud statute." *Parr v. United States*, 363 U.S. 370, 389 (1960).  It follows that mail fraud is still criminal even when the existence of fraud varies according to whether a state prohibits conduct or whether it affords entitlements.[9]  *United States v. Blandford*, 33 F.3d 685, 702 (6th Cir. 1994) (affirming a mail-fraud conviction by distinguishing a case with identical conduct because one state

---

[8]The WDCA purports to make "[t]he right to the recovery of benefits" under the WDCA "the employee's exclusive remedy against the employer for a personal injury or occupational disease," with the sole exception of "intentional tort[s]."  MICH. COMP. LAWS § 418.131(1).  However, even Michigan recognizes the limitations on its exclusivity provision. *See, e.g.*, *Napier v. Jacobs*, 377 N.W.2d 879, 887 (Mich. Ct. App. 1985) ("Similarly, state courts may not discriminate against federal causes of action and the defense of the exclusivity provision would nullify the right to proceed with a federal remedy for alleged constitutional rights violations."), *rev'd on other grounds*, 414 N.W.2d 862 (Mich. 1987).

[9]State law is not the exclusive source for defining fraudulent activity. *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1313 (11th Cir. 2000) ("[T]he fact that no duty . . . can be located in analogous [state] cases does not mean that no such duty can be located in federal law.").

proscribed the defendant's action while the other state did not), *cert. denied*, 514 U.S. 1095 (1995).  Thus, mail fraud is a sanctionable offense even when it resembles a state tort.  For these same reasons, this court has jurisdiction over the federal civil RICO claim even if the Michigan courts would not hear a claim for worker's compensation.  A federal civil RICO claim and a state claim for worker's compensation are legally distinct, even though they share factual underpinnings.

Relatedly, it is important to note that contrary to the majority's assertions otherwise, recent Michigan decisions acknowledge that the Workers' Compensation Agency ("WCA") is not equipped to adjudicate claims similar to those that sound in RICO, as it has limited authority with respect to the availability of certain types of relief and limited expertise concerning allegations based in fraud.  A recent Michigan Court of Appeals decision detailed certain of these limitations:  "It is not disputed that the WCA does not have the requisite statutory authority to hear a class action claim.  Similarly, the WCA does not have authority to grant equitable relief."  *A&D Dev. v. Michigan Commercial Ins. Mut.*, No. 301296, 2012 WL 639334, at *3 (Mich. Ct. App. Feb. 28, 2012); *see also Milton v. Cnty. of Oakland*, 213 N.W.2d 250, 252 (Mich. Ct. App. 1973) ("Our courts have found the exclusive-remedy bar inapplicable when the challenged injury . . . is not compensable under the act."); *cf. U.S. Fidelity & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1135 (9th Cir. 2011) ("This limitation is consistent with the constant theme generally applicable to administrative agencies:  that they are creatures of statute, bound to the confines of the statute that created them, and lack the inherent equitable powers that courts possess.").  The Michigan Court of Appeals also explained that "the WCA does not have experience with resolving allegations of fraud." *A&D Dev.*, 2012 WL 639334, at *4.  In other words, given the limited statutory authority and expertise of the WCA, there is no danger of encroachment or a significant overlap when a plaintiff alleges a civil RICO violation against his private employer.

Finally, I must note that I cannot agree with the majority's application of the clear-statement rule to this case.  Relying heavily on *Gregory v. Ashcroft*, 501 U.S. 452 (1991), a case involving age-discrimination claims, the majority makes the erroneous

assumption that the clear-statement rule would even apply in this context. Importantly, the majority does not reconcile its position in interpreting RICO narrowly under the clear-statement rule with the Supreme Court's clear instruction to interpret RICO broadly, a standard that the majority acknowledges in earlier sections of its opinion. As I have explained in greater detail above, because Congress has spoken clearly on the broad scope of civil RICO claims and because the predicate offense at issue is one that has been recognized time and again as within the scope of RICO, I cannot agree with the majority's determination that allowing the employees' suit to go forward would unduly encroach on Michigan's regulatory scheme or would expand the limits of RICO.

## III. CONCLUSION

For the reasons stated above, I would reverse the decision of the district court and hold that the employees have stated a claim under RICO.